1
2
3
4
5
6
7
8                      **IN THE UNITED STATES DISTRICT COURT**
9                     **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10

11  ROGER STOKELY,                           CASE NO. CV-F-03-6144 DLB HC

12              Petitioner,                  ORDER DENYING PETITIONER'S _____
                                             AMENDED PETITION FOR WRIT OF
13       vs.                                 HABEAS CORPUS AND DIRECTING
                                             CLERK OF COURT TO ENTER JUDGMENT
14  JOE McGRATH, Warden,                     IN FAVOR OF RESPONDENT

15              Respondent.                  [Doc. 9]

16  _____/

17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant

18  to 28 U.S.C. § 2254.   Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction

19  of the United States Magistrate Judge.

20                          PROCEDURAL HISTORY[1]

21        On December 16, 1996, following a jury trial, Petitioner was found guilty of four counts of

22  solicitation for murder in violation of California Penal Code[2] § 653f(b).  The jury also found true

23  two prior serious conviction allegations (§ 1170.12(a) through (d) and § 667(b) through (i)).  The

24  court sentenced Petitioner to state prison for four consecutive indeterminate terms of 25 years to life

25  pursuant to section 667(e)(2)(4) and (e)(2)(B).  The court further ordered that Petitioner's term of

26  _____

27        [1]  This information is derived from the petition for writ of habeas and Respondent's answer.

28        [2]  All future statutory references are to the California Penal Code unless otherwise indicated.

                                    1

1    imprisonment in the instant case run consecutive to that imposed in any other case for which

2    Petitioner was then serving a prison term, pursuant to section 667(c)(8).[3]

3           On August 4, 1999, the judgment of conviction was affirmed by the California Court of

4    Appeal, Fifth Appellate District and the sentence was reversed and remanded for re-sentencing.  On

5    February 23, 2000, the trial court re-sentenced Petitioner to four concurrent terms of 25 years to life.

6           Petitioner appealed this conviction to the Fifth District Court of Appeal.  On January 29,

7    2001, the judgment was affirmed.  (Exhibit B, attached to Answer.)  On February 21, 2001,

8    Petitioner filed a petition for review with the California Supreme Court.  The petition was denied on

9    April 11, 2001.  (Exhibit D, attached to Answer.)

10          On March 10, 2002, Petitioner filed a petition for writ of habeas corpus with the Stanislaus

11   County Superior Court. (Exhibit E, attached to Answer.)  The petition was denied on March 24,

12   2002.  (Exhibit F, attached to Answer.)

13          On December 4, 2002, Petitioner filed a petition for writ of habeas corpus with the Fifth

14   District Court of Appeal.  (Exhibit G, attached to Answer.)  The petition was denied on December

15   13, 2002.  (Exhibit H, attached to Answer.)

16          On January 22, 2003, Petitioner filed a petition for writ of habeas corpus with the California

17   Supreme Court.  (Exhibit I, attached to Answer.)  The petition was denied on August 13, 2003.

18   (Exhibit J, attached to Answer.)

19          Petitioner filed the instant petition for writ of habeas corpus on August 22, 2003.  Petitioner

20   filed an amended petition on March 5, 2004.  Respondent filed an answer to the amended petition on

21   June 7, 2004, and Petitioner filed a traverse on January 5, 2005.[4]

22

23

24   _____

25      [3] At the time of his conviction in the instant case, Petitioner was already serving a prison term for the conviction
     of continuous residential child sexual abuse of a child under the age of 14. However, at the time of the commission of the
26   instant offense, Petitioner had not yet been convicted of the child abuse charge.

27      [4] In reviewing Petitioner's traverse it appears that he is attempting to raise additional claims that were not raised
     in the petition including, the ineffectiveness of trial court and an Eighth Amendment claim of cruel and unusual punishment.
28   The Court will not address these claims.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994)(noting that a
     district court need not consider claims raised for the first time in a traverse).

STATEMENT OF FACTS[5]

On November 8, 1995, in a separate but related criminal case, [Petitioner] pled guilty to one count of continuous residential sexual assault of a child under the age of 14 in violation of section 288.5.  As part of the plea agreement, [Petitioner] would receive six years in prison in lieu of the potential 32 years he would face if the prosecutor was allowed to file a first amended complaint that alleged a strike prior and all of its allegations were found true.

In mid-November, [Petitioner] returned to court and voiced his desire to file a motion to withdraw his plea.  New counsel was appointed to represent [Petitioner] on his motion at that time.  A motion to withdraw his plea was later filed and remained pending throughout the date of the events described below.[6]

On December 12, 1995, Detective Heyne of the Stanislaus County Sheriff's Department went to the Public Safety Center to speak to Enoch Boatman who reportedly had obtained information about [Petitioner] wanting some witnesses and Deputy District Attorney John Goold killed.

Boatman said [Petitioner] first approached him about having these people killed around the fifth of December.  He thought [Petitioner] approached him because they had known each other for roughly 20 years and may have thought that Boatman would do it himself. [Petitioner] also knew Boatman knew people who would do the job for the right price.  Boatman denied being a hit man or having personally offered to kill witnesses for other people.

[Petitioner] told Boatman that he was worried about the possibility of serving roughly 30 years in prison on his sexual assault case.  He knew it was simply going to be a matter of the witnesses' word against his and that dead men could not speak. [Petitioner] said he was "sunk" if the witnesses testified but that the district attorney had nothing without them because the hospital report (presumably referring to the report regarding the victim's sexual assault examination) failed to reveal any evidence of such an assault having occurred.  He also wanted the district attorney who he thought was handling his case and the man who was allowing [Petitioner's] "old lady" to live with him "taken out."

[Petitioner] said he had about $7,000 to $8,000 in property that could be used as a down payment along with some other money he could get from his mother.  A second list, prepared by [Petitioner] on a yellow piece of paper, included a detailed description of this property and where it could be found.  On its flip side was a detailed description of the individuals [Petitioner] wanted killed, where they resided, the cars they drove, and some notes about their daily routines.  Only one name on the list, Kim, did not have a "K" in front of it. [Petitioner] told Boatman that he did not want Kim killed but only slapped around.

[Petitioner] explained that his mother, who was aware of his plan, was willing to provide $10,000 out of the $50,000 to $60,000 she was going to be receiving within the next few months.

Boatman initially said [Petitioner's] brother Preston was also aware of the plan as he had begun to pressure Boatman to get the job done.  He later denied Preston's involvement.

Boatman said [Petitioner] pressured him daily to get the job done.  It was not until [Petitioner] threatened to find another hit man that Boatman feigned agreement to handle the task.  Boatman told [Petitioner] that he would kill him if he (Boatman)

_____

[5] The Court finds the Court of Appeal correctly summarized the facts in its January 29, 2001, opinion. (Exhibit B, attached to Answer.)  Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

[6] The motion was ultimately denied on January 10, 1996.

3

got busted for his involvement in carrying out this plan.  At trial, Boatman denied making this statement.

In response to Detective Heyne's questioning, Boatman said he was serving time for a possession charge from a year ago but he was awaiting sentencing on a petty theft with a prior conviction.  Boatman acknowledged that he had a lengthy record comprised of mostly theft related crimes but said he did not think what [Petitioner] was doing was right since the intended victims were only trying to protect a child.  Boatman said he knew how important that was as he had just gotten his boys back who meant the world to him.

Detective Heyne did not find Boatman particularly reliable but, based on what he had seen and heard, thought Boatman was probably telling the truth.[7]  Detective Heyne felt that Boatman would have no way of knowing much of the information he had relayed unless he had gotten it from [Petitioner].  Boatman told Detective Heyne he had no reason to make up the story and, in fact, was worried that he might be charged with something because of his involvement thus far.  He had even gone so far as to read about conspiracy for his involvement.  Boatman told Detective Heyne that he wanted to help stop [Petitioner] regardless of whether he personally received any benefit in his pending case.  The detective said he would talk to the district attorney about recommending a drug treatment program for Boatman rather than a prison term.

Detective Heyne told Boatman he wanted to prevent [Petitioner] from carrying out his plan and to prosecute him for trying to have these people killed.  So, he asked Boatman if he would be willing to pretend to go along with [Petitioner's] plan.  Boatman suggested that he be wired as he had done many times before.[8]  The two men then talked about getting [Petitioner] to provide a down payment for the job and using an undercover officer to act as the hit man.

Despite the tremendous risk of great injury or even death to Boatman if the wire was discovered, the decision was made to wire Boatman the following day so that tapes could be made of his conversations with [Petitioner].  During the taped conversation that ensued between Boatman and [Petitioner], the latter reaffirmed his desire to have the four witnesses killed by a hit man and to use his property either as a down payment or as collateral until he could raise the cash needed.  They also talked about locating one of the potential victims who had moved and [Petitioner's] belief that, with the two witnesses out of the way, his molestation case would go away and he would regain custody of his daughter. [Petitioner] also told Boatman about some of his conversation with the hit man, Rick.  Finally, they discussed the fact that [Petitioner] would be looking at a term of 17 to 37 years if the district attorney was allowed to allege a strike prior. [Petitioner] realized that, even if the lower term was imposed, this meant he would not be released from prison until he was roughly 60 years of age.

Sergeant Rick Erwin of the Sheriff's Department posed as the hit man during two tape conversations with [Petitioner] that occurred over the course of two days (December 13 and 14, 1995).  In those conversations, [Petitioner] made it quite clear that he wanted to hire "Rick" to kill the four persons named in the list.  However, when he learned that it would cost him $16,000, he asked the hit man to forget about the district attorney because he could not afford the $10,000 price tag for killing him.

In a separate taped telephone conversation on December 13, 1995, [Petitioner]

---

[7]  It seems Boatman had given the detective information on one prior occasion that could not be proven in an unrelated ongoing criminal investigation.  Boatman also had a criminal history comprised of convictions for first degree burglary and forgery but also two other cases pending at the time; one for petty theft with a prior and another for drug possession.

[8]  At trial, Boatman said it was the detective who first raised the idea of wearing a wire.

spoke with Detective Heyne who was also working undercover.  During that conversation, the two men discussed possible payment methods for the hit man's fee.

Stanislaus County Sheriff's Deputy Markum posed as the hit man's assistant when he visited [Petitioner] in the Public Safety Center on December 14, 1995.  The deputy told [Petitioner] that as Asian or Filipino man would not let him in to see the property [Petitioner] had offered as collateral.  [Petitioner] said that man was one of the people he wanted killed.

They also talked about how [Petitioner] was going to pay for the job.  When the deputy asked [Petitioner] about getting some money or a gun, [Petitioner] said he could not do it for obvious reasons but thought his mother might be able to do so.  [Petitioner] said he would contact his mother as she was already aware of the situation.  A meeting between [Petitioner's] mother and the assistant was arranged but the mother never showed remorsefulness.  Detective Heyne responded that it was his recollection that [Petitioner] did not want to go through with the plan to kill Goold simply because he could not afford it.  To this, [Petitioner] replied, "On December 26, 1995, Detective Heyne identified himself as a law enforcement officer before he interviewed [Petitioner] about soliciting the murders of these people.  After waiving his *Miranda* rights, [Petitioner] initially and repeatedly said he did not know what was going on and had no reason to want these people killed.  He denied having written the pink note but acknowledged knowing the people on the list and owning the property described therein.  Before any mention had been made about the form of payment to be used to carry out the task, [Petitioner] volunteered that he had no way of getting any money while incarcerated.

[Petitioner] expressed his belief that this was "entrapment."  He professed to being a Christian and demanded to know who had set him up.

 When Detective Heyne told [Petitioner] that he had him on tape arranging the killings with an undercover office, [Petitioner] asked if the detective was sure it was him on the phone.  When [Petitioner] got an affirmative answer, his only response was "Hum."

Detective Heyne then told [Petitioner] that he was going to get a search warrant and obtain his handwriting sample which the officer believed would show [Petitioner] wrote both notes in question.  At this point, [Petitioner] claimed to be asleep even though the interview began around 10:30 in the morning.  He then asked what charges he would be facing.  Detective Heyne told [Petitioner] he would be charged with four counts of solicitation of murder.

The detective asked [Petitioner] what he hoped to accomplish by having these people killed.  [Petitioner] replied, "Nothing."  He had no response when the detective offered his own opinion on [Petitioner's] motivation - - being able to walk on his molestation charges and getting his daughter back.

The detective tried to get [Petitioner] to admit to having written the notes but [Petitioner's] concern was now focused on the sentence he would be facing on the solicitation charges.  Detective Heyne told [Petitioner] he did not deal with that part.

The detective told [Petitioner] that, other than Boatman, everyone he had spoken with about this crime was an undercover officer.  At that point, [Petitioner] started blaming Boatman saying it was Boatman who offered to find a hit man because he did not want to see [Petitioner] do so much time for his crime.  Detective Heyne told [Petitioner] that before he lied any further he ought to be aware that Boatman was wearing a wire during their conversation. [Petitioner] continued to insist the idea came from Boatman who had even stated the cost of doing away with each person ($2,000 for average citizens, $10,000 for the deputy district attorney).  He said Boatman had first approached him roughly three to four weeks before this interview.

[Petitioner] finally admitted making out the lists and that the letter "K" next to the names represented those that were to be killed.

Detective Heyne also got [Petitioner] to admit that he had gone back to court

5

on December 8th in his molestation case and withdrew his previously entered guilty plea based on an incompetency of counsel claim.

When [Petitioner] tried to persuade the detective that he had tried to call off the murders, Detective Heyne pointed out that it was still on when [Petitioner] had his last conversation with the undercover officer who posed as the hit man - - a conversation that took place after [Petitioner] returned from court.  When confronted with this knowledge, [Petitioner] responded, "I made a mistake.  I'm [sic] get myself in more trouble.  I don't need this.  You know I prayed after I left court that hopefully this won't happen."

It was at this juncture that Detective Heyne spoke of an attempt to kill Deputy District Attorney Goold and that, if successful, Goold's wife and kids would be left without a husband and father.

Detective Heyne also got [Petitioner] to admit to having discussed the plan with his mother during a jailhouse visit.  [Petitioner] said she called him crazy and refused to give him any money.

[Petitioner] acknowledged that his brother Preston was also aware of the scheme.  He too refused to get involved.

At the end of the interview, [Petitioner] said he was sorry he did it.  He explained that he was upset and mixed up.  He cited his attempt to delete Goold from the list as a sign of his Well that and I didn't want to[.]"

The Defense Case

The defense called a number of fellow inmates as witnesses.  Every one of these witnesses had been convicted of at least one felony prior to testifying.  Their crimes included such things as voluntary manslaughter, armed robbery, burglary, rape and child molestation.

Many of these witnesses testified that Boatman held himself out to be a hit man and had offered to take out witnesses in their cases.

They each confirmed [Petitioner]'s fear of being raped, killed or "turned out" (becoming a homosexual) once he got to prison.  Some of them also said that Boatman played on this fear.

Many of these witnesses said [Petitioner] feared Boatman who seemed to be pressuring [Petitioner] to do things against his will.  One witness heard Boatman tell [Petitioner] say exactly what he had told him when [Petitioner] got on the phone.  Another heard Boatman pressuring [Petitioner] for a list of some sort.  These witnesses also described many instances when Boatman would physically assault [Petitioner] either by dragging him, approaching him with balled up fists, or placing his arm around [Petitioner]'s neck.

One witness testified that [Petitioner] told him he feared his family would be killed or hurt if he did not go through with whatever it was [Petitioner] and Boatman had planned.  A few defense witnesses said Boatman even threatened to "stick" [Petitioner] if he backed out.

Many of these witnesses said they were willing to testify because they thought what was happening to [Petitioner] was not fair.  One of them went so far as to call it entrapment and another characterized [Petitioner] as the victim in this case.

[Petitioner] also took the stand.  His position at trial was that Boatman had approached him with the idea of killing the witnesses in [Petitioner]'s child molestation case. [Petitioner] did not take Boatman seriously at first.  He thought Boatman wanted the list of furniture because Boatman's sister wanted to buy it.

[Petitioner] admitted giving Boatman the list of potential victims with their correct names and addresses at a time when he believed Boatman was serious and that those whose names bore a "K" on the list would be killed.  He said Boatman told him to put the letter "K" next to the potential victims' names. [Petitioner] admitted that, without this list, Boatman would not k now who the potential victims were or

6

where they lived.

    [Petitioner] said he gave Boatman the list out of fear for his own safety and that of his family after Boatman had threatened to kill them. [Petitioner] said he never wanted anyone killed and that Boatman had set it all up.  He then began to cry.

    In response to further questioning, however, [Petitioner] admitted that one of the potential victims was responsible for his child being taken away from him.  He also admitted that he and his wife had problems over the years due to another potential victim's involvement in their lives.

    He said he took no steps to warn the potential victims or tell law enforcement of the plan.  He failed to take any action out of his continuing fear of Boatman.  He admitted telling his mother about the plan but did not tell her of Boatman's influence or intimidating tactics.  Nor did he ask her to warn the people whose names were on the list.

DISCUSSION

A.    <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    <u>Standard of Review</u>

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with

7

respect to a state prisoner's claim that was adjudicated on the merits in state court. <u>Williams v. Taylor</u>, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in <u>Van Tran v. Lindsey</u>, 212 F.3d 1143 (9th Cir. 2000)); <u>Williams v. Taylor</u>, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." <u>Lockyer</u>, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable." <u>Id.</u> (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); <u>Harris v. Nelson</u>, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>Purkett v. Elem</u>, 514 U.S. 765, 115 S.Ct. 1769 (1995); <u>Thompson v. Keohane</u>, 516 U.S. 99, 116 S.Ct. 457 (1995); <u>Langford v. Day</u>, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.    <u>Trial Court Erred in Allowing Witness to Mention Petitioner's Prior Conviction</u>[9]

Petitioner contends that the trial court erred in allowing John Goold, the victim in Count I, to make reference to his prior section 288.5 conviction.

Initially, Respondent argues that this claim is procedurally defaulted.  Petitioner raised the

---

[9] As Respondent submits because Petitioner's first claim entails arguments that must be analyzed with regard to Petitioner's second and third claims, Petitioner's first claim raised in the petition will be addressed last to avoid repetition.

1   instant claim in his state habeas corpus petitions submitted to (1) the Stanislaus County Superior

2   Court (Exhibit E); (2) the Fifth District Court of Appeal (Exhibit G); and (3) the California Supreme

3   Court (Exhibit I).

4       The California Supreme Court denied the petition with a citation to In re Dixon, 41 Cal.2d

5   756 (1953); People v. Duvall, 9 Cal.4th 464, 474 (1995); and In re Swain, 34 Cal.2d 300, 304

6   (1949).

7       A federal court will not review a petitioner's claims if the state court has denied relief of

8   those claims pursuant to a state law that is independent of federal law and adequate to support the

9   judgment. Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S.Ct. 2590, 2592 (1991); Coleman v.

10  Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546, 2553-54 (1989); See, also, Fox Film Corp. v.

11  Muller, 296 U.S. 207, 210, 56 S.Ct. 183, 184 (1935).  A state court's refusal to hear the merits of a

12  claim because of petitioner's failure to follow a state procedural rule is considered a denial of relief

13  on independent and adequate state grounds.  Harris v. Reed, 489 U.S. 255, 260-61, 109 S.Ct. 1038,

14  1042 (1989).  This doctrine of procedural default is based on the concerns of comity and federalism.

15  Coleman, 501 U.S. at 730-32, 111 S.Ct. at 2554-55.

16      There are limitations as to when a federal court should invoke procedural default and refuse

17  to evaluate the merits of a claim because the petitioner violated a state's procedural rules.

18  Procedural default can only block a claim in federal court if the state court "clearly and expressly

19  states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263, 109 S.Ct.

20  1038,1043 (1989).  For California Supreme Court decisions, this means the Court must specifically

21  have stated that it denied relief on a procedural ground.  Ylst v. Nunnemaker, 501 U.S. 797, 803, 111

22  S.Ct. 2590, 2594 (1991); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1993); Hunter v.

23  Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1991).  If the California Supreme Court denies a petitioner's

24  claims without any comment or citation, the federal court must consider that it is a decision on the

25  merits.  Hunter v. Aispuro, 982 F.2d at 347-48.

26      In addition, a federal court may only impose a procedural bar on claims if the procedural rule

27  that the state used to deny relief is "firmly established and regularly followed."  O'Dell v.

28  Thompson, 502 U.S. 995, 998, 112 S.Ct. 618, 620 (1991) (statement of Blackmun joined by Stevens

9

1    and O'Connor respecting the denial of certiorari); <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24, 111 S.Ct.

2    850, 857 (1991); <u>James v. Kentucky</u>, 466 U.S. 341, 348-51, 104 S.Ct. 1830, 1835-37 (1984).  The

3    state procedural rule used must be clear, consistently applied, and well-established at the time of the

4    petitioner's purported default.  <u>Fields v. Calderon</u>, 125 F.3d 757, 760 (9th Cir. 1997); <u>Calderon v.</u>

5    <u>United States Dist. Court (Bean)</u>, 96 F.3d 112, 129 (9th Cir. 1996), <i>cert. denied,</i> 117 S.Ct. 1569.

6         Federal courts "will not review a question of federal law decided by a state court if the

7    decision of that court rests on a state law ground that is independent of the federal question and

8    adequate to support the judgment."  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729, 111 S.Ct. 2546

9    (1991); <u>LaCrosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001).

10        If the court finds an independent and adequate state procedural ground, "federal habeas

11   review is barred unless the prisoner can demonstrate cause for the procedural default and actual

12   prejudice, or demonstrate that the failure to consider the claims will result in a fundamental

13   miscarriage of justice." <u>Noltie v. Peterson</u>, 9 F.3d 802, 804-805 (9th Cir. 1993); <u>Coleman</u>, 501 U.S.

14   at 750, 111 S.Ct. 2456; <u>Park</u>, 202 F.3d at 1150.

15        In <u>Bennett v. Mueller</u>, 322 F.3d 573 (9th Cir. 2003), the Ninth Circuit analyzed the burden of

16   proof in proving procedural default.  It held that "[o]nce the state has adequately pled the existence

17   of an independent and adequate state procedural ground as an affirmative defense, the burden to

18   place that defense in issue shifts to the petitioner.  The petitioner may satisfy this burden by

19   asserting specific factual allegations that demonstrate the inadequacy of the state procedure,

20   including citation to authority demonstrating inconsistent application of the rule.  Once having done

21   so, however, the ultimate burden is the state's." <u>Id</u>. at 586.

22        <u>In re Dixon</u> bars federal review where the claimed errors could have been, but were not

23   raised in a habeas petition on direct appeal from conviction.  <u>Dixon</u>, 264 P.2d at 515.  <u>In re Swain</u>

24   articulates the procedural requirements that a California habeas petitioner allege with particularity

25   the facts supporting his claims and explain and justify the delay in the presentation of the claims.  <u>In</u>

26   <u>re Swain</u>, 34 Cal.2d 300, 304, 209 P.2d 793 (1949).  The Ninth Circuit has held that an <u>In re Swain</u>

27   citation is a denial on procedural grounds, because such a deficiency, when it exists, can be cured in

28   a renewed petition.  <u>Kim v. Villalobos</u>, 799 F.2d 1317, 1319 (9th Cir. 1986); <u>Harris v. Superior</u>

Court, 500 F.2d 1124, 1128, (9th Cir. 1974).

In re Swain articulates the procedural requirements that a California habeas petitioner allege with particularity the facts supporting his claims and explain and justify the delay in the presentation of the claims.  In re Swain, 34 Cal.2d 300, 304, 209 P.2d 793 (1949).  The Ninth Circuit has held that an In re Swain citation is a denial on procedural grounds, because such a deficiency, when it exists, can be cured in a renewed petition.  Kim v. Villalobos, 799 F.2d 1317, 1319 (9th Cir. 1986); Harris v. Superior Court, 500 F.2d 1124, 1128, (9th Cir. 1974).

In re Duvall states the requirement that the "petition should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations.  Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing."  In re Duvall, 9 Cal.4th at 474.

The Court declines to find the instant claim procedurally defaulted based on the record before it.  In reviewing the petition for writ of habeas corpus submitted to the Stanislaus County Superior Court (Respondent's Exhibit E), Petitioner lists as Ground One, the claim that the trial court erroneously admitted the evidence of his prior conviction.[10]  To which, the Stanislaus County Superior Court stated, "No good cause for relief.  Evidence complained of was properly admitted on the issue of motive."  (Respondent's Exhibit F.)  The next line down, the Court stated, the issue was precluded as it should have been raised on direct appeal.  (Id.)  As such, it is not clear whether the Stanislaus County Superior Court found this claim procedurally defaulted.  Further, it is not clear which claims the California Supreme Court's citation to In re Dixon, 41 Cal.2d 756 (1953); People v. Duvall, 9 Cal.4th 464, 474 (1995); and In re Swain, 34 Cal.2d 300, 304 (1949), applies to.[11]  See

---

[10]  In the petition for writ of habeas corpus submitted to the Stanislaus County Superior Court, it does not appear that Petitioner raised the claim that the trial court erred in denying his Sixth Amendment motion.  (See Respondent's Exhibit E.)  Although, as noted below, Petitioner did raise that claim to the Fifth District Court of Appeal and California Supreme Court.

[11]  In the petition for writ of habeas corpus submitted to the Fifth District Court of Appeal and California Supreme Court, Petitioner raised the same three claims that he raises in the instant petition.  (See Respondent's Exhibits G and I.)

1    Koerner v. Grigas, 328 F.3d 1039, 1052 (9th Cir. 2003) (determining that when a state court

2    decision relies on different grounds, yet fails to explain which ground applies to which claims,

3    federal courts generally will not be able to resolve the resulting ambiguity.)  As such, this Court

4    cannot find the instant claim to be procedurally defaulted.[12]

5              2.      Merits of Claim

6              Petitioner contends that the trial court erred in allowing John Goold, the victim in Count I, to

7    make reference to his prior section 288.5 conviction.  Petitioner argues that although this event was

8    relevant, the probative value was substantially outweighed by the danger of an unfair trial.[13]

9              In Estelle v. McGuire, 502 U.S. 62, 69-70 (1991), the Supreme Court held that the admission

10   of evidence of prior batteries of the victim (defendant's child) that were of a serious and repetitive

11   nature of establish the non-natural nature of the victim's death, did not violate the defendant's due

12   process rights because the evidence was relevant to the issues of whether the victim's death was

13   caused by an intentional act, an element of the charge of second-degree murder.  The Supreme Court

14

_____

15         [12]  Further, with regard to In re Dixon, it was not a post-Robbins default as Respondent submits Petitioner had the
16   opportunity to raise this claim on direct appeal in his opening brief submitted on September 12, 1997.  (Answer, at 21.)
     However, Respondent states that as of the date the default was imposed by the superior court on April 24, 2004, the Dixon
17   bar was applied by the state courts independent of federal law, citing In re Robbins, 18 Cal.4th 770, 811 (1998) and Bennett
     v. Mueller, 322 F.3d at 582-583.
18         With respect to the Dixon rule, the Ninth Circuit has held that a relevant point of reference for assessing its
     application is the time at which the petitioner "had an opportunity to raise the claims on direct appeal." Calderon v. U.S. Dist.
19   Ct. For E.D. of Cal., 103 F.3d 72, 75 (9 th Cir.1996), cert. denied, 521 U.S. 1129 (1997). See also, Calderon v. Bean, 96 F.3d
     1126, 1131 (9th Cir.1996), cert. denied, 520 U.S. 1204 (1997) (evaluating the Dixon rule "at the time Bean filed his direct
20   appeal").  Because the Dixon rule precludes collateral review of a claim that could have been brought on direct appeal, the
     procedural default, though announced by the California Supreme Court when the habeas petition is denied, technically occurs
21   at the moment the direct appeal did not include those claims that should have been included for review. Fields v. Calderon,
     125 F.3d 757, 761 (9th Cir. 1997).  In this case, that moment is 1997, the year of Petitioner's direct appeal. Therefore, it was
22   not a post-Robbins denial.

23         [13]  As Respondent submits, Petitioner also contends in both his petition and traverse that the trial court instructed
24   Goold not to mention Petitioner's prior conviction; however neither Respondent nor this Court can find such an order in the
     record.  The only discussion found in the record that occurred prior to Goold's testimony, relevant to the prior conviction
25   testimony, occurred on December 9, 1996, the day before the trial began.  At that time, the court asked defense counsel if
     Petitioner wished to admit the prior conviction.  (RT 30.)  Defense counsel responded that he had not had an opportunity to
26   speak with Petitioner.  (Id.)  After that comment, no further discussion occurred regarding the testimony of Petitioner's prior
     conviction.
27         Petitioner provides no citation to the Reporter's Transcript in support of his contention.  In fact, it is highly unlikely,
     and contradictory to the record, that the trial court issued such a ruling.  There was no objection by defense counsel to
28   Goold's testimony regarding Petitioner's prior conviction (see RT 37-43.), and defense counsel extensively cross-examined
     Goold regarding Petitioner's prior conviction.  (See RT 43-45.)

1   declined to express an opinion as to whether a state law would violate due process if it permitted the

2   use of prior crimes evidence to show propensity to commit a charged crime.  Id. at 75, n.5.

3        The due process inquiry in federal habeas review is whether the admission of evidence was

4   arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  See Walters v. Maass, 45

5   F.3d 1355, 1357 (9th Cir. 1995).  The admission of evidence, however, only violates due process if

6   there are no permissible inferences that the jury may draw from such evidence.  Jammal v. Van de

7   Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

8        California Evidence Code section 1101(b) specifically allows for the introduction of

9   evidence of a defendant's prior convictions.  Evidence Code section 1101(b) states:

10        Nothing in this section prohibits the admission of evidence that a person committed a
          crime, civil wrong, or other act when relevant to prove some fact (such as motive,
11        opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or
          accident, or whether a defendant in a prosecution for an unlawful sexual act or
12        attempted unlawful sexual act did not reasonably and in good faith believe that the
          victim consented) other than his or her disposition to commit such an act.

13        Although in this instance there is no trial court ruling admitting the evidence, as there was no

14   motion to exclude the evidence or objection to the testimony when given, the admission of the

15   evidence was nonetheless proper.  As the Stanislaus County Court found when it denied Petitioner's

16   habeas corpus petition, the "[e]vidence complained of was properly admitted on the issue of

17   motive."  (Exhibit F, attached to Answer.)  The admission of the evidence was not arbitrary, but

18   rather based upon the fact that Goold's prior dealings with Petitioner would have given Petitioner a

19   motive to solicit murder.  As such, the evidence was highly relevant and permissible under section

20   1101(b).

21        Moreover, as Respondent submits, Petitioner has offered no authority, and this Court finds

22   none, that Evidence Code § 1101(b), or its application in this case, rendered the trial fundamentally

23   unfair.  Although Petitioner claims that the evidence was only "arguably relevant," and the

24   "probative value was substantially outweighed by the danger of an unfair trial," Petitioner has not

25   demonstrated how this evidence could have rendered the trial unfair.  To the contrary, Goold's

26   testimony properly informed the jury of Petitioner's motive to have him killed, based on Goold's

27   prior prosecution of Petitioner for child molestation charges.  A point highly contested by defense

28

13

1    counsel on cross-examination of Goold.[14]

2         Based on the foregoing, the state courts' determination was not contrary to, or an

3    unreasonable application of, clearly established Supreme Court precedent.

4    D.    Trial Court Erred in Denying Defense's Sixth Amendment Motion

5         Petitioner contends that the trial court erred in denying his Sixth Amendment motion.

6    Petitioner asserts that the motion had been raised in chambers, in an off-the-record-discussion, and

7    was later denied on the record.  Petitioner contends that "objectionable part's [sic] were used during

8    the trial."  Specifically, Petitioner contends that the trial court erroneously denied the right to have

9    counsel present during his interview with Detective Heyne.

10        1.    Objectionable Portions of Transcript Were Not Used Against Petitioner at Trial

11        On December 9, 1996, prior to the beginning of the trial, the court noted that it wanted to

12   memorialize some of the discussions that had been held in chambers with respect to evidentiary

13   issues.  (RT 9.)  Defense counsel affirmed that the transcripts were an accurate representation of the

14   interview between Detective Heyne and Petitioner, despite some typographical errors that were to be

15   corrected.  (RT 9-10.)  The court then addressed four specific objections defense counsel had raised

16   in chambers regarding portions of the transcript.  The first portion of the transcript that the court

17   excluded was on page 8.  The court ordered five lines from the transcript deleted.  (RT 10.)  The

18   court explained that the following part of the interview would be omitted: "'[Detective Heyne:] The

19   only reason they didn't die is because you hired an undercover officer with the sheriff's office to do

20   the killing.  That's why they didn't die.  Otherwise they would have died,' and [Petitioner] says,

21   'No, they wouldn't of.'"  One page 8 of the transcript, this language is not present.  (Exhibit K,

22   attached to Answer.)   Therefore, despite Petitioner's claim to the contrary, this "objectionable part"

23   was not "used during the trial."

24        Based on defense counsel's in-chambers objection, the second portion of the transcript the

25   court was going to strike was on page 18 of the transcript.  The court initially ordered the following

26   discussion stricken, starting on line six:

27   _____

28        [14] It is noteworthy that Petitioner's claim is highly defeated by the fact that defense counsel never sought to exclude this evidence nor objected to it during trial, which provides further support for its admission.

[Detective Heyne]: "To top it off" - And to top it all off you're having the witness killed but you're soliciting to have D.A. John Goold killed. You're going to wipe out a D.A. that had a wife and children at home killed because he's prosecuting your case on molestation.

[Petitioner]: I wasn't going to have my wife kill the kids.

[Heyne]: Well, but he had a wife and kids.

[Petitioner]: Who?

[Heyne]: D.A. John Goold. You were going to have him killed. His wife and kids were going to be without a father and husband and [if] this was a regular hit man you were talking to he would have been killed.

(RT 10-11.) Prior to the introduction of the transcript, or the playing of the taped interview, defense counsel withdrew his objection to part of this portion of the transcript. On December 10, 1996, during a conversation outside the presence of the jury, defense counsel stated:

I'll state on the record that on page 18 we had agreed that we were going to remove from line eight after the word "kill" through line 17 including the word "to" and I am withdrawing my objection to that particular section and saying instead that we should start the deletion at line 14 even though it's slightly higher than line 14 after the word "Goold" and the word "talking to."

(RT 110-111.)[15] Based on defense counsel's withdrawn objection, only the portion of the transcript mentioned during defense counsel's later statement was omitted. The portion defense counsel objected to on December 10 was redacted, and the transcript read as follows:

Heyne: And to top it off you're having your witnesses killed but you're soliciting to have D.A. John Goold killed you were going to wipe out a D.A. that had a wife and children at home killed because he's prosecuting your case on molestation.

[Petitioner]: I wasn't going to have my wife kill the kids.

Heyne: Well, but he had a wife and kids.

[Petitioner]: Who?

Heyne: D.A. John Goold he would have been killed cause you told the guy over the phone my mom's [sic] coming into a bunch of money and you'll get it.

[Petitioner]: My mom's [sic] truthfully didn't know anything about it.

(Respondent's Exhibit K, at 18.) As set forth above, the objected to portions of the transcript were not used against Petitioner at trial, as the record clearly reflects those statements were redacted.

The third statement the court ordered deleted from the transcript was on pages 21 and 22. The court stated that the deletion would begin with the phrase, "Once again, the only reason you didn't succeed because the person you were trying to get killed these people were under cover officers. [sic]" (RT 11.) The deletion continued through line 10 on page 22, where Detective Heyne

---

[15] The objectionable part, in bold below, was as follows:

[Heyne]: D.A. John **Goold. You were going to have him killed. His wife and kids were going to be without a father and husband and [if] this was a regular hit man you were talking to....**

1    said,

2            If there had been an actual hit man involved there you would have taken the
             properties down payment you would have started killing people then they would have
3            been there talking about murder.  As it stands right now you were talking about
             solicitation for murder.  The only reason we're not talking about murder is because
4            you solicited an undercover officer otherwise you would have succeeded in what you
             were trying.

5
     (RT 11.)   On pages 21 and 22 of the transcript submitted to the jury, these phrases do not appear.
6
     (Respondent's Exhibit K, at 21-22.)  It is clear from the record that the objected-to portions of the
7
     transcript were not published to the jury.
8
             Finally, the fourth statement the court ordered redacted was on page 24.  (RT 12.)  The court
9
     ordered lines 6 through 18 and 19 removed, beginning with the line, "You have the ability like
10
     everybody else in here to say you're crazy."  (RT 12.)  The court further explained that the redacted
11
     transcript should read as follows:
12
             [Petitioner]: Well 'cause Eddie Boatman I feel I was being entrapped on this.
13           [Heyne]: I - Well, that's what you say all right.  I see it differently.
             [Petitioner]: Because he came up to me and approached me that's
14           unintelligible.
             Heyne: You weren't entrapped.  You were caught and the only reason you're
15           sorry is because you were caught and then going in.
             [Petitioner]: No truthfully I'm not sorry 'cause I was caught.  I'm sorry and so
16           forth.  I'm sorry about it after I did it.  I'm sorry I thought about it after I did it and
             the truth of the matter is I'm sorry I went through it and actually did it an
17           unintelligible.

18   (RT 12.)  The transcript published to the jury contains the redacted version ordered by the court.

19   (Respondent's Exhibit K, at 24.)  Further, as Respondent submits, there are numerous lines missing

20   from the transcript on page 24 further supporting the fact that the objectionable portion was omitted.

21   Therefore, based upon a review of the published transcript, it is clear that the court did not allow the

22   objectionable portions of the transcript to be published to the jury.  As such, Petitioner's claim fails.

23           2.    Denial of Sixth Amendment motion

24            As Respondent submits, it appears that Petitioner is arguing that the trial court erroneously

25   denied the right to have counsel present during his interview with Detective Heyne.  During the

26   hearing on December 6, 1999, defense counsel argued,

27            In addition to the general objection under the Sixth Amendment in that these
             charges arose out of a prior case which Mr. Stokely was represented by counsel and
28           the belief that the law enforcement should have contacted that counsel before taking

                                                  16

1    any statement for him were advising him of his constitutional rights should have been
2    made contact with that counsel. . . .

3    (RT 12-13.)  After defense counsel listed additional grounds for objecting to the transcript, and cited

4    case law pertaining to his additional arguments, defense counsel clarified that his "first objection

5    under Sixth [A]mendment goes to the entire statement."  (RT 16.)  The prosecutor, in opposition,

6    argued that the Sixth Amendment right to counsel does not kick in until a complaint is filed and an

7    information is filed with a grand jury indictment.  (RT 16.)  The court then stated that it was not

8    aware that the defense motion to redact the transcript was made on "general Sixth Amendment

9    grounds."  (RT 17.)  In denying the defense motion, the court explained, "the fact is that it is a

10   separate crime, it's not the same crime and therefore the motion is denied."  (RT 17.)

11       The Supreme Court in <u>Texas v. Cobb</u>, 532 U.S. 162, 173 (2001), reiterated that the Sixth

12   Amendment right to counsel attaches only to a charged offense, as well as to uncharged offenses that

13   may be said to be the "same offense" under the so-called <u>Blockburger</u> test.  Under <u>Blockburger v.</u>

14   <u>United States</u>, 284 U.S. 299, 304 (1932), the offenses are the same "where the same act or

15   transaction constitutes a violation of two distinct statutory provisions, the test to be applied to

16   determine whether there are two offenses or only one is whether each provision requires proof of an

17   additional fact which the other does not."

18       Applying the <u>Blockburger</u> test, the instant offense of solicitation of murder is in no way

19   similar to the child abuse case which had already been charged and Petitioner was represented by

20   counsel.  Further, although Petitioner was represented by counsel in the child abuse case, no

21   prosecution had commenced in the current case for solicitation of murder charges.  Therefore, no

22   Sixth Amendment right to counsel had attached, and the trial court properly denied the defense

23   motion.  Thus, the state courts' determination was not contrary to, or an unreasonable application of,

24   Supreme Court precedent.

25   E.    Ineffective Assistance of Appellate Counsel

26       Petitioner contends that appellate counsel was ineffective for failing to raise the two grounds

27   discussed above.  Petitioner claims that appellate counsel did not review the record and therefore

28   rendered ineffective assistance of counsel.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); See, also, Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, she would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998). The presumption of reasonableness is even stronger for appellate counsel because he has wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized as one of the hallmarks of effective appellate assistance. Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir.1989). Appealing every arguable issue would do disservice to the Petitioner because it would draw an appellate judge's attention away from stronger issues and reduce appellate counsel's credibility before the appellate court. Id. Appellate counsel has no constitutional duty to raise every nonfrivolous issue requested by petitioner. Id at 1434 n10 (citing Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

For the reasons explained above under sections C and D, because there is no merit to Petitioner's claims, it follows that appellate counsel was not ineffective for failing to raise them on appeal. As previously stated, appellate counsel has no constitutional duty to raise every nonfrivolous issue requested by Petitioner. Miller v. Keeney, 882 F.2d at 1434 n 10; see also Jones v. Smith, 231 F.3d 1227, 1239 n. 8 (9th Cir. 2000) (Ninth Circuit held that appellate counsel's failure

1  to raise issues on direct appeal did not constitute ineffective assistance when appeal would not have

2  provided grounds for reversal); Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985) (same).  As to

3  the first claim, the trial court properly followed California Evidence Code section 1101(b) and

4  allowed testimony of Petitioner's previous conviction to show motive to kill Goold.  Appellate

5  counsel could not have been deficient for failing to object to this ruling as it was in accordance with

6  California law.  As to the second claim, all objectionable portions of the transcript were redacted and

7  the trial court properly denied Petitioner's Sixth Amendment motion to exclude the taped police

8  interview.  Because Petitioner's claims lack merit, he cannot show any resulting prejudice by

9  appellate counsel's failure to raise them on direct appeal.  Strickland, 466 U.S. at 687.  For these

10  reasons, the state

11  courts' determination of this issue was not contrary to, or an unreasonable application of, clearly

12  established Supreme Court precedent.

13  F.    Ineffective of Appellate Counsel in Raising Eighth Amendment Claim

14          Petitioner contends that appellate counsel should not have raised an Eighth Amendment

15  claim of cruel and unusual punishment as it was foreclosed by the Supreme Court's ruling in

16  Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct.1166 (2003), and counsel should have filed a People v.

17  Wende brief.  Petitioner's claim is without merit.  Applying the Strickland standard outlined above,

18  and assuming this is a properly framed argument, Petitioner has not demonstrated that counsel was

19  ineffective by raising what he claims was a frivolous argument.  Because counsel was not

20  ineffective, Petitioner cannot show any resulting prejudice.

21                                              ORDER

22          Based on the foregoing, it is HEREBY ORDERED that:

23          1.      The petition for writ of habeas corpus be DENIED; and

24          2.       The Clerk of Court is directed to enter judgment in favor of Respondent.

25           IT IS SO ORDERED.

26      **Dated:    September 19, 2005**              _____**/s/ Dennis L. Beck**_____
    3b142a                                        UNITED STATES MAGISTRATE JUDGE

27

28

                                                 19